# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTHONY M. SORIANO, | CASE NO. 1:10-cv-01986-BAM |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS AND ORDERING JUDGMENT FOR COMMISSIONER |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Anthony M. Soriano, by his attorneys, Law Offices of Lawrence D. Rohlfing, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for Supplemental Security Income under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.)* (the "Act"). The matter is currently before the Court on the parties' cross-briefs, which were submitted, without oral argument, to the Honorable Barbara A. McAuliffe, United States Magistrate Judge. Following review of the record as a whole and applicable law, this Court affirms the agency's determination to deny benefits to Plaintiff.

I.  **Administrative Record**

   A.  **Procedural History**

Plaintiff was insured under the Act through June 30, 2005. On July 31, 2006, Plaintiff filed for disability insurance benefits, alleging disability beginning November 30, 2000. His claim
///

was initially denied on February 5, 2007, and upon reconsideration on July 6, 2007. Plaintiff appeared and testified at a hearing on September 18, 2008.

At the hearing, Plaintiff's attorney conceded that no medical records established that Plaintiff was disabled prior to his last insured date since Plaintiff's residual functional capacity allowed him to do at least sedentary work. AR 96. If that were the case, stated the attorney, Plaintiff would not be disabled until September 26, 2007, when he would be deemed disabled under the medical vocational guidelines. AR 96. Accordingly, Plaintiff sought to withdraw and dismiss his disability insurance claims and proceed with a supplemental security income (SSI) claim under Title XVI. AR 96. Administrative Law Judge Christopher Larsen granted Plaintiff's motion and ordered the case to proceed under Title XVI. AR 96.

On January 7, 2009, Judge Larsen denied Plaintiff's application. Plaintiff appealed to the Administrative Council, which remanded the case to the ALJ on June 30, 2009. The Council directed the ALJ to (1) properly resolve Plaintiff's Title II claim; (2) consider further Plaintiff's severe impairments and provide rationale in accordance with 20 C.F.R. § 416.921 and Social Security Ruling 96-3p; (3) further consider treating and nontreating source opinions pursuant to 20 C.F.R. §§ 404.1527 and 416.927, and Social Security Rulings 96-2p and 96-6p, and to explain the weight given to the opinion evidence; (4) further evaluate Plaintiff's subjective complaints and provide rationale in accordance with regulations applicable to symptom evaluation (20 C.F.R. §§ 404.1529 and 416.929) and Social Security Ruling 96-7p; (5) further consider Plaintiff's maximum residual functional capacity, providing appropriate rationale with references to the record in accordance with 20 C.F.R. §§ 404.1545 and 416.945, and Social Security Ruling 96-8p; (6) determine the specific work activity requirements of Plaintiff's past work as a sexton; and (7) obtain additional evidence from a vocational expert to clarify the effect of the assessed limitations on Plaintiff's occupational base, reflecting the specific capacity and limitations established by the record as a whole. AR 126-27.

The remand hearing took place on January 26, 2010. Plaintiff pursued claims both for disability insurance benefits under Title II and Supplemental Security Income under Title XVI. On February 29, 2010, Judge Larsen again denied Plaintiff's application for disability benefits.

On July 28, 2010, the Appeals Council denied review. Plaintiff filed a complaint with this Court on October 18, 2010.

### B.     Agency Record

**Plaintiff's testimony.** Plaintiff (born September 26, 1957) completed the twelfth grade but received neither a diploma nor a GED. He completed a year and a half of community college studies in criminal justice but left to pursue employment.

Plaintiff last worked for two weeks in 2000, picking up litter at the Fresno Fair. Because Plaintiff was diabetic, his employer permitted him to rest for ten minutes every half hour. Before that he worked for a caterer that prepared meals for forestry fire fighters. In 1998, he worked as sexton at St. Columba Church, performing general maintenance work such as lighting, electrical, plumbing, roofing, and painting. He never worked as a construction worker.

Plaintiff complained of daily continuous pain in his left knee, which was relieved by Hydrocortisone.[1] Heating pads and liniment also helped. His knee pain was aggravated by bending, squatting, and excessive walking. Plaintiff's left knee did not swell, but it "popped," preventing Plaintiff from rising from the floor without assistance. Twice a day, Plaintiff's right knee was also painful until he "warmed it up." AR 32.

Plaintiff also experienced continuous pain across his back at the waistline, which was aggravated by lying down too long, bending, stooping, and walking. Medication and stretching exercises relieved his back pain. He lay down to relieve his back for fifteen minutes to an hour at least once a day, and sometimes as many as five times a day.

His medication made him drowsy. He had little energy and felt tired after 45 minutes to an hour of activity. He suffered from dizziness if he got up too quickly.

Plaintiff also complained of numbness between the ring and middle finger of his right hand that caused discomfort and difficulty gripping things about four or five times monthly. Plaintiff assumed that it was arthritis that would be relieved with Vicodin.

---

[1] Oral hydrocortisone is used to relieve inflammation and to treat certain forms of arthritis, and various skin, blood, kidney, eye, thyroid, and intestinal disorders. www.nlm.nih.gov/medlineplus/druginfo/meds/a682206.html (July 31, 2012).

3

Plaintiff estimated that he could walk two to three blocks, could stand about an hour, and could sit about an hour. He had difficulty concentrating and could focus about 45 minutes before getting drowsy.

Plaintiff also testified that he saw "spiders" in his right eye, but his doctor did not treat them, telling Plaintiff that they were typical at his age. He had received shots to treat his hepatitis.

Plaintiff lived with his older brother and sister-in-law in their home. He cooked, did laundry, made his bed, swept the driveway, shopped, and mowed the lawn using a self-propelled mower. To relieve his diabetes, Plaintiff exercised by walking, riding a bike, and stretching.

**Community Medical Center.** On or about November 15, 2000, Plaintiff fell from a tractor. On November 17, 2000, he was first seen in the emergency room at Community Medical Center, complaining of mild to moderate abdominal pain. Plaintiff had abrasions, bruises, four broken ribs, and pneumothorax. He was treated and admitted for observation.

On August 18, 2003, Plaintiff presented in the emergency room seeking a prescription for his diabetes medication, which he had not taken since he was released from jail on July 4, 2003. His blood sugar was 416. From 2003 to 2006, Plaintiff received treatment for diabetes mellitus, Hepatitis C, hypertension, hyperlipedemia, and lower back pain through a clinic at University Medical Center.

Plaintiff's lower back pain was first noted on July 28, 2004, when it was attributed to Plaintiff's performing cement work a month before. The pain was sharp, radiating into his legs. Notes from Plaintiff's examination on February 28, 2005, reported that Plaintiff was working construction with a friend and helping to care for his father. He reported drinking two beers daily.

On April 18, 2005, Dr. Huang noted that Plaintiff continued to drink beer and that a liver biopsy could not be scheduled until Plaintiff abstained from alcohol consumption. Plaintiff denied fatigue or weakness, stating that he continued to ride his bike. On July 18, 2005, Dr. Rillo reported that because of his Hepatitis C, Plaintiff needed to refrain from consuming alcohol but that Plaintiff reported that he continued to smoke and drank a glass of wine daily. Although medical professionals encouraged Plaintiff to stop drinking alcohol so that he could receive

treatment, Plaintiff did not "want to stop just yet." AR 305. On March 13, 2006, Dr. Patrus noted that Plaintiff had back pain, which was controlled with medication. On the same day, an unidentified medical practitioner noted that Plaintiff elected not to pursue treatment of his Hepatitis C because it would require him to abstain from alcohol.

On September 8, 2006, Plaintiff complained of low back pain on the right side that was not radiating. (He also reported knee pain that was being treated by a specialist.) Dr. Patrus's examination of his back revealed no tenderness or deformity. Dr. Patrus substituted Tramadol for the robaxin and ibuprofen that Plaintiff had been taking and sent him for an x-ray. X-rays of Plaintiff's lumbar spine taken October 3, 2006, revealed compression fractures of L1 and L4. A subsequent MRI showed no compression fractures, however, only mild cental canal stenosis at L2-L3, L3-L4, and L4-5, as well as mild right foraminal narrowing at L5-S1.

In November 2007, Dr. Ahmed diagnosed a bleeding ulcer, which he attributed to Plaintiff's long-term use of nonsteroidal inflammatory drugs to relieve back and knee pain.

On December 12, 2008, and February 17, 2009, Plaintiff reported that he was walking for exercise. On April 22, 2009, Plaintiff's hand pain was diagnosed as tendinitis. Plaintiff reported that he had recently begun riding a ten-speed bicycle.

On May 28, 2009, Plaintiff was evaluated for pain management services. Plaintiff reported that he had experienced chronic back pain since he was 18 years old and that his current pain ranged from eight to ten on a scale of ten.

**Dr. Ghazal.** Plaintiff apparently injured his knee while working at St. Columba's Church. In a letter dated December 17, 1998, orthopedist Malcolm F. Ghazal, M.D., advised the church's insurer, CalComp, that a follow-up examination indicated that Plaintiff's left knee was gradually improving, although he was not yet permanent and stationary. Dr. Ghazal observed that Plaintiff walked with "a very good gait" and no anomalies, was able to walk on his heels and toes, had a full range of motion, could squat 95%, and had no edema. Plaintiff reported that he was no longer experiencing constant pain and was continuing with physical therapy. He used a bicycle for exercise and took ibuprofen for pain with good results.

At a follow-up appointment on February 1, 1999, Plaintiff again reported improvement, although he still reported difficulty with repeated running, hopping, and squatting. Dr. Ghazal observed a normal gait, including walking on heels and toes, squatting to 60%, hopping on the left leg, full range of motion, tender patellar facet with good quads function, negative meniscal signs, and stable ligaments. Plaintiff was not yet permanent and stationary.

The administrative record includes no further documents until December 2002, when Dr. Ghazal administered a series of five Hyalgan injections. After each shot, Dr. Ghazal directed Plaintiff to continue his usual and customary activities as tolerated.

On July 14, 2003, Plaintiff saw Dr. Ghazal for the first time in seven months, complaining of increasing knee pain, and difficulty squatting, kneeling, climbing, lifting, and carrying heavy objects. The changes were not associated with any trauma and appeared to be cumulative. Dr. Ghazal observed a very mild left-sided limp that improved after a few steps. Plaintiff was able to walk on his heels and toes and to squat with discomfort in the anterior portion of his left knee. The patellofemoral joint was very tender; the medial lateral joint lines were mildly tender. There was mild to moderate crepitis. Dr. Ghazal requested that Kemper Insurance, which insured Plaintiff's employer Joint Venture Golden West, authorize a series of Hyalgan injections. The injections were administered from July 23 through August 20, 2003. After each injection, Dr. Ghazal directed Plaintiff to continue with his usual and customary activities. On August 29, 2003, Dr. Ghazal advised Kemper, "[Plaintiff] reports continuing with usual and customary activities at work which include crawling, kneeling, squatting, and climbing, which he occasionally finds difficult." Plaintiff continued to report pain. Dr. Ghazal observed that Plaintiff walked without difficulty, was able to heel and toe walk, had negative McMurray's and reverse McMurray's tests, an had an active range of motion from 1 to 120 degrees with moderate crepitis. The knee was stable on all planes.

On November 17, 2003, Plaintiff, who was then working as a truck driver, reported that changes in the weather had made squatting, kneeling, and climbing more difficult. His gait was normal, he could walk heel and toe, and he could squat 60% down. He had trouble hopping on

6

his left leg. Examination revealed mild patellofemoral tenderness but no medial or lateral tenderness. X-rays showed "essentially normal findings, except for mild lateral patellar tilt." AR 326. Dr. Ghazal directed Plaintiff to continue his usual and customary activities and to take Motrin as needed.

On May 19, 2004, Plaintiff complained of increasing discomfort, particularly when squatting or kneeling. He conceded that his increased pain could be attributable, at least in part, to his mother's death the week before. Plaintiff continued to work at his usual and customary activities. Dr. Ghazal observed a mild left-sided limp that improved after a few steps. Plaintiff could walk on his toes, but not on his heels because of a heel spur. He could squat partway down. Dr. Ghazal observed patellofemoral crepitis with mild effusion and tenderness. The doctor suggested that Plaintiff's discomfort might be attributable to external rotary contracture of his hip. Hyalgan injections were not necessary. Plaintiff was directed to continue his usual and customary activities and to return in one year.

On November 15, 2004, Plaintiff complained of increasing knee problems with crepitis and difficulty squatting, bending, and climbing. Dr. Ghazal observed significant crepitis, a start-up limp, bogginess of the knee, and diffuse medial and lateral tenderness. He asked Kemper to authorize a series of Hyalgan injections.

On July 13, 2005, Plaintiff told Dr. Ghazal his left knee was becoming more symptomatic. He was having difficulty with prolonged weightbearing, climbing, squatting, and kneeling. Pain sometimes woke him during the night. Dr. Ghazal observed a left-sided start-up limp, mild to moderate crepitis, excellent range of motion, diffuse medial and lateral joint line tenderness, and motor strength of 4+/5. The doctor requested authorization for Hyalgan injections but directed Plaintiff to continue his activities as tolerated.

From August 17 through September 16, 2005, Dr. Ghazal administered a series of five Hyalgan injections into Plaintiff's left knee. Plaintiff's pain, crepitis, swelling, limp, and range of motion remained unchanged until after the fourth injection when pain was reduced and the doctor's examination showed improvement. From July 6 through August 9, 2006, Dr. Ghazal

administered a second series of injections. Although Plaintiff felt worse after the first injection, subsequent examination indicated improved crepitus, swelling, limp, and range of motion.

In a September 20, 2006 letter to Broadspire Services, Dr. Ghazal reported that the Hyalgan injections helped Plaintiff, but not as much as previously. Plaintiff complained of pain on the lateral side of his left knee. Dr. Ghazal observed that Plaintiff walked without a limp, walked on his heels and toes, had a full range of motion, was tender to the lateral patellar facet, had mild patellofemoral crepitis, and displayed no fusion nor meniscal signs. Plaintiff refused to squat more than 25%. Dr. Ghazal directed Plaintiff to continue a home exercise program intended to correct his patellar alignment and directed him to return in six months.

When Plaintiff arrived to see Dr. Ghazal on October 20, 2006, he had a letter from Broadspire Services indicating that Dr. Ghazal was not authorized to provide further treatment to him. Dr. Ghazal did not examine Plaintiff.

**Dr. Shantharam.** On March 19, 2007, orthopedist S.S. Shantharam, M.D., examined Plaintiff for a consultation requested by Broadspire Claims Services. Dr. Shantharam observed no external signs of abnormality, and x-rays showed no acute bony abnormality. The doctor opined that Plaintiff had non-specific pain in his left knee, probably chondromalacia. Because neither therapy nor injections had resolved Plaintiff's pain, Dr. Shantharam recommended a brace and directed Plaintiff to perform exercises on his own. He encouraged Plaintiff to return to work, but to avoid kneeling, squatting, and climbing.

**Dr. Stoltz.** Internist Steven Stoltz, M.D., performed a consultative examination of Plaintiff for the agency. Plaintiff told Stoltz that he last worked October 16, 2006, and that he lived with his girlfriend. He smoked three cigarettes a day and drank a six-pack of beer a week. Stoltz observed that Plaintiff was in no distress. The examination revealed Plaintiff's physical condition to be normal. Specifically, Dr. Stoltz observed no tenderness in Plaintiff's back. Straight leg raising and Laseque's sign were negative. Plaintiff had no muscle spasm and even muscle tone. The range of motion of his back was within normal limits.

///

Dr. Stoltz diagnosed Type II diabetes mellitus, bilateral knee pain, low back pain, Hepatitis C, hypertension, and hypercholesterolemia. Plaintiff's main medical issues were his ongoing diabetes mellitus as well as knee and back pain. Dr. Stoltz opined:

> Based on my history, observations and physical examination findings, the claimant does not have any restrictions on lifting or carrying activities. Standing, walking, and sitting would be without restrictions except that he might require a change of position for relief of his back pain and knee pains approximately every 60 minutes. He does not require the use of an assistive device. Activities such as kneeling, crouching, and crawling could only be done on an occasional basis and not a frequent basis. He does not require any other environmental restrictions.

AR 347.

**Vocational expert.** Thomas Dachelet testified as vocational expert. He opined that Plaintiff's only previous work that constituted substantial gainful activity was his work as a church sexton, which was medium unskilled work.

For the first hypothetical question, the ALJ directed Dachelet to assume an worker of Plaintiff's age, education, and work experience, who is capable of medium physical exertion, but could only occasionally kneel, crouch, and crawl. Dachelet opined that such a person could not perform Plaintiff's prior work as a sexton or janitor. The hypothetical person could perform any sedentary or light unskilled position, however, as well as approximately fifty per cent of available jobs requiring medium exertion.

For the second hypothetical question, the ALJ directed Dachelet to assume an worker of Plaintiff's age, education, and work experience, who could lift and carry fifty pounds occasionally and 25 pounds frequently. The individual must be able to change positions from sitting, standing or walking every hour throughout the day, but could otherwise stand, walk, or sit for a total of six hours. Dachelet opined that this individual could perform Plaintiff's former job as sexton.

For the third hypothetical question, the ALJ directed Dachelet to assume the same individual described in hypothetical two, with the added restriction that he could only occasionally kneel, crouch, or crawl. Dachelet opined that this individual could not perform the job of sexton, but could perform approximately one-third of the available light, medium, and sedentary positions.

The ALJ then asked Dachelet if his answer to the third hypothetical would change if the individual needed to change position every twenty minutes. Dachelet replied that such a person would not be employable.

For his final hypothetical, the ALJ directed Dachelet to assume a worker of Plaintiff's age, education, and work experience, who could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and walk a total of two hours in an eight-hour work day; could sit less than six hours in an eight-hour work day; could occasionally climb ramps and stairs; could never climb ropes, ladders, or scaffold; could occasionally balance and crouch; could stoop less than occasionally; and could never crawl. When Dachelet hesitated, the ALJ suggested that the hypothetical individual would be limited to sedentary work. Dachelet agreed.

## II.  Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability. 20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f). The process requires consideration of the following questions:

Step one:   Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.

Step two:   Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.

Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

| | | |
|---|---|---|
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of November 30, 2000.  His severe impairments were degenerative joint disease of the left knee, hepatitis C, lumbar spondylosis, and compression fractures of the lumbar spine.  None of these impairments met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

Plaintiff retained the residual functional capacity to lift and carry fifty pounds occasionally and 25 pounds frequently, and to stand or walk six hours and to sit six hours in an 8-hour work day.  He was able to occasionally kneel, crouch, and crawl.  Plaintiff was able to perform his past work as a sexton (DOT No. 389.667-010), which was medium unskilled work.

### III.     Scope of Review

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

the ALJ's findings are supported by substantial evidence. *See Sanchez v. Secretary of Health and Human Services*, 812 F.2d 509, 510 (9th Cir. 1987). "Where the evidence as a whole can support either outcome, we may not substitute our judgment for the ALJ's." *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).

### IV.   **Plaintiff's Credibility**

Plaintiff's sole contention is that the ALJ erred in finding him not credible.

An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional requirement. *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). But if he or she decides to reject a claimant's pain testimony after a medical impairment has been established, the ALJ must make specific findings assessing the credibility of the claimant's subjective complaints. *Ceguerra v. Secretary of Health and Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). *See also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991). "[T]he ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester*, 81 F.3d at 834, *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988). He or she must set forth specific reasons for rejecting the claim, explaining why the testimony is unpersuasive. *Orn*, 495 F.3d at 635. *See also Robbins v. Social Security Administration*, 466 F.3d 880, 885 (9th Cir. 2006). The credibility findings must be "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than

candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

> The Ninth Circuit has summarized the applicable standard:
>
> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

In the hearing decision, the ALJ discussed in detail inconsistencies between Plaintiff's subjective complaints and the corresponding objective evidence.

> After carefully considering the evidence, I find [Plaintiff's] medically-determinable impairments can reasonably be expected to produce his alleged symptoms, but his statements about the intensity, persistence, and limiting effects of those symptoms are not credible to the extent they are inconsistent with my assessment of his residual functional capacity.
>
> Mr. Soriano's testimony that his medication makes him drowsy is inconsistent with his multiple statements to doctors that the medication does not give him any side effects. His testimony that he has not worked since the year 2000 is not consistent with his statements to medical professionals that he could do his usual and customary work, nor is it consistent with his statement to medical professionals that he was working as a truck driver, nor is it consistent with his statements to medical professionals that he worked in construction with a friend.

///

> As for the opinion evidence, none of the doctors has indicated that Mr. Soriano is disabled from any jobs in the national economy . . . . .

AR 14 (*citations to the record omitted*).

As detailed in the summary of the administrative record above, substantial evidence supported the ALJ's reasoning and conclusions regarding Plaintiff's lack of credibility. No evidence in the record supports a conclusion that Plaintiff's medications make him drowsy. In July 2004, Plaintiff attributed his back pain to his performing cement work a month before. In February 2002, Plaintiff told his doctor at Community Medical Center that he was working construction with a friend. In April 2005, Plaintiff denied feeling weak or fatigue and told Dr. Huang that he continued to ride his bicycle. Although Plaintiff testified that he knee pain allowed him to walk only two or three blocks, in 2008 and 2009, Plaintiff repeatedly told his physicians that he was walking for exercise.

Dr. Ghazal's treatment records consist exclusively of worker's compensation reports, even after 2000, when Plaintiff told the agency that he had stopped working. Following Plaintiff's 1998 knee injury, Dr. Ghazal noted continued improvement as Plaintiff reported that his pain was subsiding and that he was riding a bicycle for exercise. Throughout his years of treating Plaintiff, Dr. Ghazal consistently directed Plaintiff to continue performing his usual and customary activities. Treatment records from 2003 reflect Plaintiff's employment with Joint Venture Golden West. In November 2003, Plaintiff was working as a truck driver. In a 2007 consultation requested by an insurance claims company servicing Plaintiff's workers' compensation claim, Dr. Shantharam prescribed a brace but encouraged Plaintiff to return to work. Plaintiff told Dr. Stolz that he had last worked on October 16, 2006.

Review of Plaintiff's testimony and the record reveals dramatic inconsistencies between Plaintiff's testimony, his prior representations to physicians, and objective medical evidence in the record. This Court will not second-guess the ALJ's assessment of Plaintiff's poor credibility.

## III.   Conclusion and Order

The Court finds that the ALJ applied appropriate legal standards and that substantial credible evidence supported the ALJ's determination that Plaintiff was not disabled. Accordingly,

1 | the Court hereby DENIES Plaintiff's appeal from the administrative decision of the
2 | Commissioner of Social Security.  The Clerk of Court is DIRECTED to enter judgment in favor
3 | of the Commissioner and against Plaintiff.

          IT IS SO ORDERED.

   Dated:   August 7, 2012                    /s/ Barbara A. McAuliffe
                                          UNITED STATES MAGISTRATE JUDGE